Good morning, Your Honors. Doug Keller on behalf of Mr. Hernandez. The district court erred in this case when it denied Mr. Hernandez's Batson challenge, and it erred again later at trial when it denied his Rule 29. Beginning first with the Batson issue, the district court applied the wrong legal analysis in evaluating whether Mr. Hernandez had made a prima facie case of discrimination. The court infamously speculated about the reason why the prosecutor might have struck a minority juror. This is exactly what the same district court did in Santos-Cordero, and just like this court reversed in Santos-Cordero, Mr. Hernandez would ask this court reverse here as well. The government's main argument, or at least one of its main arguments on appeal, is that this court doesn't need to find the court, the district court abuses discretion because you can pick out certain pieces of the court's reasoning that are consistent with the law. But I think you have to look at the totality of what the district court said in explaining its reason for denying a prima facie case. The court asked the counsel if they had anything to support their Batson challenge other than the fact that the juror was a minority person, and the counsel said no. So why isn't that enough for the court's determination? Well, two reasons, Your Honor. First, I think primarily this is the totality of the circumstances test, which the district court itself acknowledged. So I don't think defense counsel, as just a practical matter, has to point to every individual thing that supports their case. Isn't it the counsel's burden to make the prima facie case? And the court and the counsel said these jurors are minorities. That was its only reason. That's correct. The court says, well, there's other minorities in the jury, in the finery. That's not enough to make your prima facie case. Do you have anything else? And the counsel said no. Well, then I'd point, Your Honor, to Miller L., the Supreme Court case also involving a Batson challenge. Their trial counsel didn't do the comparative analysis in the Batson context. Nevertheless, the U.S. Supreme Court on its own decided to do the comparative analysis because defense counsel, even though he hadn't raised it, it was in the record. And then the Supreme Court considered it and did the analysis. So I'm asking this court to do the exact same thing. And, in fact, Miller L. Provided comparative analysis in your briefing. Yes, I did, Your Honor. There was two white jurors who were very comparable to the district minority jurors. And the government quibbles about how similar they are, but we're just talking about step one. Did we even beat our burden to make an inference of discrimination? I haven't found any case in which a defense attorney, if they can establish that comparative analysis, that doesn't meet their prima facie burden. I gather each side had six preemptories. Is that right? That's correct. I think we might have had more, Your Honor. Okay. Well, okay. But that will work through the same way in my question. The government challenged on a preemptory basis two jurors who were Hispanic. As far as I can tell, we don't know from the record whether the government exercised its other preemptories. That's correct. We don't know how many they exercised. Were you at trial? I was not. And I don't know, and frankly, I think I could. It would surprise me if the government exercised only two. I mean, it would be a rather idiotic move if you've got, say, six to use only two and direct both of them to Hispanic jurors. But the record is simply silent on that point. It is, Your Honor. And frankly, I can't assume that the government did only two, but I can't assume that they did more. That's correct, Your Honor. And frankly, I went back and looked at the record myself, and I couldn't find anything to indicate how many they had exercised. And trial counsel also didn't recall. And how many, not just minorities, this is a narrower question, how many Hispanics were on the jury that was seated? I know later on the judge goes through and says I've got this many minorities, but he includes among those minorities non-Hispanic minorities. I believe two or three, Your Honor. The record isn't entirely clear, but I believe two or three. And I do think certainly the fact that some minorities weren't struck by the government is a good fact for them. But that isn't enough to defeat our prima facie case. In fact, in cases like ---- I don't think our case law really gives you a prima facie case on these numbers. Well, not on the numbers alone, but we have more than the numbers. We have the numbers. The question was asked, counsel, do you have anything other than the numbers? And counsel says no, I just have the numbers. So do you want to say there's more? Well, that's not what your predecessor on the defense side said at trial. So all I can do is point this court to Miller L., where that's exactly what happened. And I understand sort of the feeling of unfairness to the district court that we didn't identify more when we had the opportunity. But at the same time, the point here is to make sure the court considers the totality of the circumstances. And I think that's what the Supreme Court recognized in Miller L. And I'll note that Miller L. was a habeas case. So the Supreme Court should have even been more deferential to the state trial court. But nevertheless, it was concerned enough to make sure that discrimination hadn't infected the jury selection process. And so they went ahead and did the analysis and did the comparison themselves the first time on appeal, which is what I'm asking this court to do here. Now, I think also the court doesn't even need to necessarily do the prima facie case analysis. I think it can simply just remand like it did in Santos-Cordero instead of doing the analysis the first time on appeal. And I think that flows from the fact that the crux of our argument is the district court didn't apply the right legal standard. And so the case should be remanded for a court to do the proper analysis under the proper standard. I get the argument. And I think what I'm about to say probably is not legally relevant. But I would be more nervous about what's possibly or close to or arguably a Batson violation if the underlying case were more difficult. All I can say is, like Your Honor pointed out, it doesn't matter. Right. So, you know, I think there are more important values here at stake other than simply whether my client was obviously innocent. I'm sorry, obviously guilty or whether there's an overwhelming case. The most important thing is or a important value is to make sure that race discrimination doesn't affect the jury selection process. I get that. If the court has no further questions on the Batson issue, I can discuss the consent to reapply issue. The government also didn't prove beyond a reasonable doubt that it had Mr. Hernandez had not did not have the consent to reapply for admission. Can you help me understand what the difference is between consent to reapply and consent to enter? So the fifth circuit, I guess the government cites this Sanchez-Millan case says, no, they're the same thing. And in Orozco-Acosta, we don't say that, but we come pretty close to saying it's the same thing. So help me understand what the procedure is, what the steps are and what the difference is between those things. I actually started that fifth circuit case, Your Honor. I think it makes the point, actually, that the two steps are different. Once you've been removed, you have to first ask the attorney general or the secretary of homeland security for permission even to start the process of coming back. You're deported, okay, and then you're not allowed in. This is you're deported under 13. So you've been denied admission, you've been deported, and you're not allowed to enter unless prior to reembarkation, which is a weird word unless you're getting on a boat, you're not allowed unless the attorney general has expressly consented to such aliens reapplying for admission. So what step, I've been deported, what steps would I need to take in order to enter the country? You'd first need to file an I-212, which is the request to the attorney general or really the secretary of homeland security for permission to get a visa. So that's permission, so it's an application for permission to obtain a visa. Yes. And what is that? What's the statutory basis for that? I-212. Okay. And so once you receive that permission, you can't come back to the United States. At that point, you've met step one, and so you move to step two, and then you have to go to the consular office and ask for a visa to come back to the country. So if I filed an application for consent, so it's an application for consent to reapply for a visa, and then what do I get from the attorney general's office? I've sent in my application. You either get a granted or denied I-212, and if it's granted, great. You still can't come back to the country. You then have to apply for a visa at your consular office, and they could, of course, either grant you a visa or deny you a visa based on their own criterion, or the attorney general could or the secretary could simply deny you that initial consent to even reapply, in which case you also can't come back. So if I'm granted, if I get a granted I-212 and I take that to the consular office and I make an additional application for a visa? Yes, Your Honor. And then the consular office has its own rules or procedures for granting or denying a visa. Sure. So you could be applying for a visa, for example, that they've already used up their allotment for the year, so the consular office would deny you the ability to obtain the visa based on that reason. It just depends on what visa you're applying for, as I understand it. Thank you. So I see I'm out of time, but if I could just briefly. Yeah, please go ahead. I think you probably have something to say in response to this exchange. I do. Well, I think sort of what makes this case unusual and different, certainly in my experience, is the fact that we know Mr. Hernandez at some point applied at step one. We know he attempted to get the consent to reapply to begin with, which sort of makes this case different than most because at that point, since he had made an application, the question is, was it granted? If it was granted, he's innocent. If it was denied, then he's guilty. So in 2013 and 2014, I guess, he was deported again, so apparently didn't have consent to be in the country, at least. We know that. We know he definitely did not have consent to be in the United States. He hadn't met step two. So he hadn't applied for a visa or been granted a visa in 2013 or in 2014. He was deported both times. The record is silent as to what happened, but the jury certainly could have inferred that either he wasn't granted a visa or he just never applied. Okay. So that's sort of, I think, the crux of my argument, what makes this case different. The Court has the government. Thank you. And then we'll give you a chance to respond. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Colin McDonald for the United States. Beginning first with the sufficiency argument, there's not one single case that would support the defense's timeless consent view of 1326. The government at trial produced more than sufficient evidence to establish that the defendant entered the United States without consent. The United States put on evidence that this defendant was deported in 2013 and in 2015, and based on the special verdict finding from the jury, the jury necessarily found that the United States proved this defendant was deported April 15th of 2015. But what he's saying, what the opposing counsel is saying, and the language seems to say, is that there's a difference between a consent to reapplying for admission and permission to enter, that it wouldn't be enough to have a granted I-212 waiver. You'd also have to have a visa issued. That's correct. So he could be in the country without a visa, but have gotten consent, I guess, to reapply. Am I understanding that correctly? You are, Your Honor. So that's true, that if someone has been deported, the United States says we're going to add an additional step for you to be able to come back. You can't just go to the consulate. You have to first go to the Attorney General, get his permission, then go to the consulate and see if the State Department will let you in at that point. So 1326 says that if you've not received, if you've not done that first step, going to the Attorney General first, that you can be criminally punished. And it tethers the consent of the Attorney General to the most recent deportation. So the language from 1326 says, and I'm reading, quoting the relevant parts of 1326, any alien, quote, any alien who has been deported and thereafter enters the United States unless prior to his reembarkation at a place outside the United States, the Attorney General has expressly consented to such aliens reapplying for admission, shall be subject to criminal penalty. So the argument, as I understand it, is that prior to his reembarkation could happen at any time. There's nothing that says after his being deported and prior to his, you know, so that's his argument as I understand it. Correct. And so just based on the plain text of 1326, so 1326 is broken up into Paragraph 1, which says any alien who, one, has been deported, has been removed, et cetera, and the end of Paragraph 1 is and thereafter, and then Paragraph 2.  That's correct, Your Honor. And certainly like a common sense view of this. So let's say someone was deported in 2000 or received, was deported in 2000, then received permission in 2000 from the Attorney General to come back. Then let's say he was deported again in 2001 and 2002 and 2005 and 2006, 2007. The defense theory is that that one consent in 2000 insulates this defendant from any future 1326 prosecution, which I think just leads to an absurd reading of 1326. And certainly this defendant in 2013, I believe this is SCR 4 through 5, on the notice form of him being deported, it explicitly tells him that under 1326, this was in 2013, under 1326 you have to go first to the Attorney General to receive express consent from him to return or you will be subject to criminal penalty. The application that defense has alerted the court to was in 2004. But he was deported and the United States proved at trial that he was deported in 2013 and in 2015 and that he did not seek permission from the Attorney General. He did not do Step 1 after those times. And the defendant doesn't dispute that. He does not dispute that he did not seek consent from the Attorney General after 2013 or 2015. This is just basically just going to the structure and how the system works. Let's assume that he had sought permission timely after the most recent deportation, which I understand you're saying is not what happened, but let's assume that did happen. He goes to the consular office, asks for a visa, doesn't get a visa, and then comes into the United States improperly because he doesn't have a visa. What would you prosecute him under? I think we would prosecute him under a 1325 illegal entry, which can be either a misdemeanor or a felony based on if he had been convicted of a 1325 before. So it's your argument that the word thereafter modifies both re-enter and receiving consent? That's correct. And that that's the only real logical reading of the statute? Correct. So yes, thereafter in paragraph 1 modifies what comes in paragraph 2. Both steps of paragraph 2, the re-enter step and the without consent are both phrases? Yes, Your Honor. So if the Attorney General had consented to a reapplication to admission, would that have shown up in the files that were discussed at the trial? Yes, it would have. There was the AFILE custodian testified, and he had reviewed both the claims database and CIS, both DHS immigration databases, to check to see if the defendant had applied and further if the Attorney General had consented. And there was no evidence that the defendant had applied or that the Attorney General had consented after 2013. They didn't go back to 2004 to explore what happened with that. And all of the testimony about the 2004 application occurred in about 15 lines of trial testimony that was never cross-examined by the defense. They actually didn't cross-examine the AFILE custodian at all. They just left that hanging. That wasn't their theory at trial. It wasn't their theory at trial. And they, in fact, admitted in closing argument that there was sufficient evidence on whether the defendant had the consent to enter. They told the jury, you've been given puzzle piece 4, which is whether he entered without permission. You know he doesn't have permission, so you might be asking, why are we here? And they said, well, there's no proof of a voluntary entry, which was then proved, which is an argument they're not pursuing now. Let's say the record was even more bollocked up on the consent or permission. Would the inferences associated with his admissions at the time he was discovered and the circumstances of him hiding and all, would that separately support the jury's verdict? Yes, it would, Your Honor. And Orozco Acosta says exactly that, that the defendant's field admissions where he says, I don't have papers to be here, I don't have permission to be here, that that is proof that he entered without consent. Further, the circumstances of his apprehension where he's five miles away from the nearest port of entry in an area where illegals frequently cross, shows that he knew he did not have permission to come here. He did not enter through a port of entry. He knew full well that he acted without consent, and the jury certainly could infer that he did not have the consent based on his statements and his actions. Turning to the Batson claim, it's clear that the defendant did not make out a prima facie case of discrimination. The defendant had to show under the totality of the relevant facts that there was an inference of discrimination. Here, the defendant had one fact, and it was that two minorities were struck. It was not two Hispanics. It was one Hispanic and one of unknown ethnicity. And this Court is clear that those facts, that single fact alone, is not a prima facie case. Hernandez Herrera stands for that principle. Vasquez Lopez stands for that principle. But that was not the only relevant fact to the Court's consideration. There were six minorities on this jury. Six. And it could have been ten, but the defendant himself struck four minorities. So this jury could have been ten, a ten-minority panel, but the defense struck four, leaving six. That included two Hispanics on this panel. I have not found a single case with a jury composed such that where racial discrimination has been found. Are we required to do a comparative juror analysis? I think that there's – I don't think that you're required to. I think there is case law to suggest that you can do that on de novo review. We would say at the first step, though, that there was no clear error here in the Court's finding that there's no prima facie case because the case law is clear that this was not a prima facie case, given the sole fact that the defendant raised to the Court's attention. And then the other relevant facts, which the Court did indicate that there were six minorities on this jury and could have been ten if it were not for defendant's own strikes. And so if the Court were to take a de novo review based on the defense has raised that the Court used a wrong standard, the Court, throughout his analysis, said fastly that this is not – he has not made a prima facie case. And then there was one brief mark at the very end where the Court said something that would indicate a slightly wrong standard. And we would say that that was not significant to the Court's analysis because it's clear here that there was no prima facie case that was made. Even if the Court were to do the comparative analysis, it falls well short. One of the jurors that was stricken, one of the minority jurors that was stricken, her cousin was currently, right at this moment, being prosecuted for bank robbery, and the cousin's father was also routinely in the criminal justice system. And so I think the defense's attempt to show that these jurors were similar falls flat. Unless there are any further questions, I will submit. Okay, thank you. Now, we took you over time, but why don't we put a minute back on the clock, please. Thank you, Your Honors. Just a few brief points. I would direct the Court to take a look at it if it hasn't already. Miller L., I do think it's dispositive to the question of whether this Court is required to do the de novo analysis on the comparative juror analysis. Your adversary just said something that caught my attention. I had assumed that Mr. Gaboya was a Hispanic. That's not been established? The record is unclear. I think he was unidentified in the record. Okay. I would also direct the Court to Yates v. Shirley, where this Court said, quoting a long line of cases, that the mere fact that minorities are sat on the jury cannot defeat a prima facie case. Moving briefly to the 1326 issue, with respect to whether field omissions are enough, they are certainly not enough to prove this element. The cases the government points to are cases in which there was never any evidence that the defendant actually made an application, the initial application. So when there's no evidence at all that the person made an application to begin with, certainly field statements can be enough to prove you never received permission to reapply to begin with. But the problem for the government is that being found here without status is consistent with someone who never received a visa, but it's also consistent with someone who received permission to get a visa and was denied the visa for whatever reason. So it doesn't give the jury a factual basis to make an inference beyond a reasonable doubt that he never received that initial consent to begin with. Thank you, Your Honors. Thank you, both sides, for your helpful arguments. United States v. Hernandez-Quintanilla, submitted for decision.
judges: W. Fletcher, Ikuta, Freudenthal